AMY JANE LONGO
REGIONAL TRIAL COUNSEL
Finola H. Manvelian
Wendy E. Pearson
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Los Angeles Regional Office
444 South Flower St, Suite 900
Los Angeles, CA 90071
(323) 965-3835 (Longo)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                              Plaintiff<br><br>                    vs.<br><br>TELEFONAKTIEBOLAGET LM ERICSSON,<br><br>                              Defendant. | Case No.<br><br>**COMPLAINT** |

Plaintiff U.S. Securities and Exchange Commission (the "SEC") alleges:

## SUMMARY

1.      This matter arises from violations of the anti-bribery, recordkeeping, and internal accounting controls provisions of the Foreign Corrupt Practices Act ("FCPA") [15. U.S.C. §§ 78dd-1, 78m(b)(2)(A)-(B)] by defendant Telefonaktiebolaget LM Ericsson ("Ericsson"), a multinational networking and telecommunications equipment and services company headquartered in Sweden.

2.      From 2011 through early 2017, Ericsson subsidiaries paid approximately $62 million in bribes to government officials through third parties in Djibouti, Saudi Arabia, and China to obtain or retain business. Ericsson realized approximately $427 million in profits from

business obtained through the use of these illicit payments. Ericsson's practice involved either entering into agreements with third party consultants who had connections with or access to public officials, and/or paying for travel and entertainment expenses for foreign officials and sometimes their families in order to influence their decision-making.

3.      In Vietnam and Indonesia, Ericsson subsidiaries used consultants to create slush funds of approximately $56 million and the ultimate recipients of these funds were unknown. The consultants in Vietnam and Indonesia served strictly as intermediaries to transfer money to third parties.

4.      In China, Ericsson subsidiaries made approximately $31.5 million in payments pursuant to sham service provider agreements under which no legitimate services were provided. These payments were made so as to continue to use and pay third party agents in China in contravention of Ericsson's policies and procedures.

5.      Ericsson also made a payment in the amount of $450,000 through a subsidiary to a consulting company in Qatar that was not in compliance with Ericsson's internal accounting controls. Employees of the Ericsson subsidiary, at the direction of a senior employee, created a sham consultancy agreement to disguise the payment to the consultant.

6.      These illicit payments were improperly characterized in the books and records of Ericsson's subsidiaries as legitimate expenses and consolidated in Ericsson's financial statements, which were filed with the SEC throughout the relevant period.

7.      As a result of its conduct in Djibouti, Saudi Arabia, and China, Ericsson, through its subsidiaries, violated Section 30A of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78dd-1] when it authorized or paid bribes to foreign officials in order to obtain or retain business.

8.      As a result of its conduct in Djibouti, Saudi Arabia, China, Vietnam, Indonesia and Kuwait, Ericsson, through its subsidiaries, violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] when it created false books and records by failing to accurately or completely record payments to third parties and to foreign officials. Ericsson also violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] by failing to have sufficient internal accounting controls in place to detect and prevent the authorization or payment of improper payments.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action under Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

10.     Ericsson, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain acts or transactions constituting the violations by Ericsson occurred in this district.

## DEFENDANT

12.     **Telefonaktiebolaget LM Ericsson** ("Ericsson" or the "Company") is a multinational networking and telecommunications equipment and services company headquartered in Sweden. Throughout the relevant time period, Ericsson's common shares were registered with the SEC pursuant to Section 12(b) of the Exchange Act [15 U.S.C. § 78l] and traded in the form of American Depositary Shares that were represented by American Depositary Receipts listed on the NASDAQ. As such, Ericsson was required to file reports, including Form

3

20-F, with the SEC pursuant to Section 13(a) of the Exchange Act [15 U.S.C. § 78m] and related

rules thereunder, and was an "issuer" within the meaning of the FCPA [15 U.S.C. § 78dd-1].

## RELATED ENTITIES

13.     Ericsson AB ("EAB") is a wholly owned subsidiary of Ericsson established in

Sweden. EAB is one of Ericsson's largest subsidiaries. Ericsson exercised control over the

activities of EAB. EAB's board included some Ericsson executives, and EAB's senior managers

reported to Ericsson's management. EAB's books and records were consolidated into Ericsson's

financial statements filed with the SEC.

14.     Ericsson Egypt Ltd ("Ericsson Egypt") is a majority-owned foreign subsidiary of

Ericsson. The head of Ericsson's Middle East region and individuals employed by Ericsson

Egypt oversaw Ericsson's operations in North East Africa, including Djibouti. Ericsson Egypt's

books and records were consolidated into Ericsson's financial statements.

15.     Ericsson operated in China through its foreign subsidiaries, including Ericsson

(China) Company Ltd., Ericsson (China) Communications Co., Ltd. and Ericsson Hong Kong, as

well as its indirect majority-owned joint venture, Nanjing Ericsson Panda Communications

Company Ltd., (collectively referred to as "Ericsson China"). The financial statements of

Ericsson China were consolidated with those of Ericsson.

16.     PT Ericsson Indonesia ("Ericsson Indonesia") is a majority-owned foreign

subsidiary of Ericsson established in Indonesia. The financial statements of Ericsson Indonesia

were consolidated with those of Ericsson.

17.     Ericsson Vietnam Co. Ltd. ("Ericsson Vietnam") is a wholly owned foreign

subsidiary of Ericsson established in Vietnam. The financial statements of Ericsson Vietnam

were consolidated with those of Ericsson.

4

18.     Ericsson Resource & Competence Center Sdn. Bhd. ("Ericsson Malaysia"), is a wholly-owned foreign subsidiary of Ericsson that operates in Malaysia. The financial statements of Ericsson Malaysia were consolidated with those of Ericsson.

## FACTUAL ALLEGATIONS

### A.     The Djibouti Bribery Scheme

19.     Beginning in approximately 2011, Ericsson, through the head of Ericsson's Middle East region and employees of Ericsson Egypt, authorized and directed the payment of bribes in Djibouti in order to obtain a contract from a state owned telecommunications company ("Djibouti SOE").

20.     EAB had planned to bid for a large networking contract with the Djibouti SOE in 2010. An Ericsson Egypt employee informed Ericsson's head of Northeast Africa that EAB could win the contract with Djibouti SOE if EAB paid bribes to foreign officials in Djibouti. Later, these employees also heard this directly from a Djibouti foreign official.

21.     Fearing that they may not be awarded the contract, the head of Ericsson's Middle East region and employees of Ericsson Egypt devised a plan to bribe the government officials. For this purpose, EAB, through its Ethiopia branch, retained a consulting company (the "Djibouti Consultant") that was owned by the wife of a senior Djibouti foreign official and controlled by the same Djibouti foreign official. This fact was known to the head of Ericsson's Middle East region and employees of Ericsson Egypt.

22.     In October 2010, EAB submitted a bid to Djibouti SOE, and on May 11, 2011, Djibouti SOE signed a contract with EAB valued at approximately €20,300,000 ($29 million).

23.     On June 16, 2011, EAB's branch in Ethiopia and the Djibouti Consultant signed a consulting agreement. The services contemplated in the contract were never intended to be

5

performed. In fact, the consulting agreement was a sham and was intended primarily to funnel bribes to the Djibouti foreign official.

24.     Thereafter, Ericsson's head of Northeast Africa received pressure from two foreign officials ("Djibouti Foreign Official 1" and "Djibouti Foreign Official 2") for EAB's Dubai branch to pay the Djibouti Consultant. Both of these foreign officials had decision-making authority over the bid for the contract with Djibouti SOE.

25.     For example, on August 14, 2011, Ericsson's head of Northeast Africa stated in an email, "I just got another call from [Djibouti Foreign Official 1]. We need to wire the payment within the current week."

26.     On August 17, 2011, Ericsson's head of Northeast Africa stated, "I just got now a call from [representatives of Foreign Official 2]. I really need ... to wire the $."

27.     On August 18, 2011, Ericsson's head of Northeast Africa emailed a payment processor, "Tell me what can I do to make [the payment] happen fast. I am getting strong pressures from [Foreign Official 2]. This is not nice."

28.     On August 23, 2011, the Djibouti Consultant told Ericsson's head of Northeast Africa that if the consulting payment was not made, the Djibouti SOE would no longer be interested in pursuing business with Ericsson.

29.     On or around August 24, 2011, EAB, through its branch in Dubai, transferred approximately $1,441,050 (EUR 1,000,000) to the Djibouti Consultant through a U.S.-based correspondent account.

30.     EAB, through its Dubai branch, made two additional payments to the Djibouti Consultant in or around October 2011 and March 2012. The three payments to the Djibouti

Consultant totaled approximately $2.1 million. The payments were made in U.S. dollars through correspondent bank accounts in New York.

31.    Ericsson's head of Northeast Africa, who authorized the payments, knew that the Djibouti Consultant would transfer a significant portion of the consulting fees to the two foreign officials with decision-making power in exchange for obtaining the contract with Djibouti SOE.

32.    On September 21, 2011, Ericsson issued a press release announcing that the company had been awarded a contract with the Djibouti SOE.

33.    The head of Ericsson's Middle East region and Ericsson Egypt employees falsely booked the payments to the Djibouti Consultant in the books of EAB's Dubai branch under a cost of sales account, when they were, in fact, bribes to foreign officials in Djibouti. The EAB Dubai branch's books and records were consolidated into Ericsson's financial statements.

**The Saudi Arabia Bribery Scheme**

34.    In 2012 and 2013, Ericsson, through the Saudi Arabia branch of EAB, made payments to two consultants in Saudi Arabia ("Saudi Consultant A" and "Saudi Consultant B") in connection with securing business from a state-owned telecommunications company ("Saudi SOE").

35.    Saudi Consultant A and Saudi Consultant B were retained because the head of EAB's Saudi branch believed that their owners had influence over Saudi SOE officials making decisions on contracts pertaining to Saudi SOE.

36.    The head of EAB's Saudi branch and the head of Ericsson's Middle East region signed these consulting agreements and authorized the payments to the consultants while knowing or recklessly ignoring red flags which indicated a high probability that at least a portion of these commissions were intended for, or would be passed to, foreign officials at Saudi SOE to obtain or retain telecommunication contracts.

7

37.     For example, the contracts with both consultants described identical services. The services contemplated in the contract were never intended to be performed.

38.     In fact, besides its owners, Saudi Consultant A had only one employee. Additionally, Saudi Consultant A had only one client – EAB's Saudi branch. Saudi Consultant A was formed in January 2012, almost one year after the agreement was signed, specifically for the purpose of receiving payments pursuant to the consulting agreement with EAB's Saudi branch. Similarly, one of Saudi Consultant B's references was a senior official at Saudi SOE.

39.     EAB's Saudi branch employees did not follow Ericsson's internal policies in retaining the two consultants. EAB's Saudi branch employees completed the due diligence on Saudi Consultant A and Saudi Consultant B almost one year after the agreements with the consultants were signed. The due diligence was a sham and was conducted only because it was necessary to begin making payments.

40.     In or around December 2012, in connection with payments made to both consultants, a senior foreign official with decision making authority at the Saudi SOE pressured the head of EAB's Saudi branch to make higher payments to Saudi Consultant A and Saudi Consultant B.

41.     Saudi Consultant B claimed to be based in Saudi Arabia, yet some of the payments EAB made through its Saudi branch to Saudi Consultant B were sent to a Channel Islands bank account. Some of the payments to Saudi Consultant B were made on the same day as the payments made to Saudi Consultant A.

42.     Between March 2012 and February 2013, Ericsson, through EAB's Saudi branch, paid a total of approximately $40 million to the two Saudi Consultants and received nine contracts from Saudi SOE valued at more than $700 million.

8

43.    Internally, EAB employees referred to these payments as "corporate marketing fees" which some employees believed to be code for bribes. Additionally, one EAB executive acknowledged that the payments to the consultants were extraordinarily large.

44.    An employee of EAB's Saudi branch communicated with the owners of Saudi Consultant A and Saudi Consultant B regarding the sham consulting agreements using U.S.-based email servers.  Ericsson recorded the payments to Saudi Consultant A and Saudi Consultant B on the books of EAB's Saudi branch as cost of sales. The financial results of EAB's Saudi branch were consolidated into Ericsson's financial statements.

**The Saudi Arabia & China Leisure Trips**

45.    Ericsson, through EAB's Saudi branch and Ericsson China, funded leisure travel and entertainment for foreign officials from Saudi SOE and China, respectively, in exchange for new or continuing business from state-owned entities.

46.    Between 2015 and 2017, EAB's Saudi branch paid for lavish non-business related trips for two Saudi SOE employees who had decision-making authority at the Saudi SOE. At that time, the Saudi SOE had contracts with several different telecommunications companies. EAB, through its Saudi branch, paid for travel and entertainment expenses for the Saudi SOE employees, and occasionally one of their spouses, in order to secure an advantage over Ericsson's competitors in obtaining additional and continuing orders from the Saudi SOE.

47.    For example, EAB's Saudi branch paid for plane tickets, which cost approximately $70,000, for a Saudi SOE executive and seven of his family members to travel from Riyadh, Saudi Arabia to Los Angeles, California, between August 8 and September 15, 2016. Additional pleasure trips to Paris were provided to the two Saudi SOE employees. EAB's Saudi branch paid for spa services, shopping, and accommodations at five star hotels on some of these trips.

48.     During this period, EAB's Saudi branch generated at least $40.54 million of gross revenues from the Saudi SOE.

49.     Similarly, Ericsson China, paid for leisure trips for Chinese foreign officials in order to obtain business from a state-owned telecommunications company in China ("China SOE"). These trips were paid through an off-the-books structure created at the direction of the head of Ericsson's Asia Pacific Region in order to disguise expenditures for gifts, trips, and entertainment of Chinese government officials and employees of China SOE. Ericsson China employees effectuated the structure by knowingly signing purchase requests and approving invoices submitted by third party service providers for services that were never provided. In at least one instance, Ericsson China employees facilitated payments to a fake service provider for the purpose of funneling money to agents and to cover travel and entertainment expenses for Chinese foreign officials.

50.     From 2013 to 2015, Ericsson China paid $19.5 million to third party service providers, in part to fund gifts and leisure trips given to Chinese foreign officials.

51.     Ericsson China paid approximately $3.2 million in travel expenses provided from May 2013 through December 2013 for executives at the China SOE to destinations including the United States, Australia, and France. In one instance, in May 2013, Ericsson China paid for a delegation of China SOE employees for a trip to the United States and the United Kingdom, with luxury accommodations, including stops in Palo Alto, Las Vegas, Phoenix, Chicago, and London. The China SOE awarded Ericsson China contracts between May 2013 and December 2013 worth over $294 million.

52.     Ericsson China held letters of guarantee at several hotels and a travel agency that allowed Ericsson's agents to place travel and entertainment expenses for Chinese officials on Ericsson China's tab.

53.     The trips described above appear to have been purely for sightseeing and had no legitimate business purpose. No Ericsson, EAB Saudi branch, or Ericsson China employees accompanied the foreign officials from Saudi Arabia or China, and the foreign officials did not participate in any business meetings or product demonstrations on these trips.

54.     The trips described above were falsely booked as legitimate travel and entertainment expenses in the books of Ericsson China and EAB's Saudi branch which were consolidated into Ericsson's financial statements.

**B.     Vietnam**

55.     From at least 2011 through 2015, Ericsson, through entities including EAB, Ericsson Vietnam and Ericsson Malaysia engaged a purported sales consultant ("Vietnamese Consultant") to provide consultancy services for various projects with customers in Vietnam. The Vietnamese Consultant did not provide these services. Instead, Vietnamese Consultant maintained a slush fund in Vietnam, through which payments were made to third parties. In total, the Vietnamese Consultant was paid, through manual payments, approximately $11.4 million between 2011 and 2015.

56.     Vietnamese Consultant served strictly as an intermediary, who used this slush fund to make payments to third parties. The recipients were disguised through the use of code names such as "Exim," "Ivory" and "Rezone".

57.     Ericsson Vietnam did not have adequate internal accounting controls to identify the significant red flags raised by the payments to Vietnamese Consultant. Vietnamese

Consultant was incorporated in the British Virgin Islands and held its bank account in Hong Kong. Although Vietnamese Consultant dissolved in 2007, payments continued through 2015.

58.     Ericsson Vietnam employees understood that the slush funds managed by Vietnamese Consultant were connected to Vietnamese customers, several of which were state-owned. A portion of slush funds managed by Vietnamese Consultant were given to customers as cash gifts.

59.     Ericsson, through its employees and agents, falsified Ericsson's books and records in order to conceal the slush fund payments. The payments were improperly booked to a cost of sales account in EAB's and Ericsson Vietnam's books.

60.     The financial results of EAB and Ericsson Vietnam were consolidated into Ericsson's financial statements.

**Indonesia**

61.     Between 2012 and 2015, Ericsson Indonesia made approximately $45 million in payments to a purported sales consultant ("Indonesian Consultant"), in order to create slush funds to be managed by Indonesian Consultant with oversight and direction from employees of Ericsson Indonesia.

62.     Indonesian Consultant served as an intermediary to transfer money to unknown third parties. The payments to Indonesian Consultant were made pursuant to sham contracts between Ericsson Indonesia and Indonesian Consultant for services that were never performed. Moreover, Indonesian Consultant's invoices did not reflect the true nature of or contain a description of the services provided.

63.     Ericsson Indonesia employees referred to the slush funds using code names. One slush fund, the "fridge," held millions of dollars of cash in U.S. dollars used for "off the book

expenses" including customer entertainment and a pleasure trip to Bali. Ericsson Indonesia
maintained other slush funds with indecipherable purposes such as "Operational."

64.     To conceal them, the improper payments were recorded in the books of Ericsson
Indonesia in a "Customer Service" account under cost of sales.

65.     Ericsson Indonesia's books and records were consolidated into Ericsson's
financial statements.

**Kuwait**

66.     In December 2013, Ericsson, through EAB's branch in Qatar, made an improper
payment to a consultant ("Kuwait Consultant") pursuant to a sham contract for services that were
never actually performed.

67.     In or around October 2011, a state owned telecommunications company in
Kuwait opened a request for proposals to upgrade its radio access network ("Kuwait Contract").
EAB bid for the Kuwait Contract.

68.     An employee of EAB entered into an oral agreement with Kuwait Consultant for
assistance in obtaining Kuwait Contract. The Kuwait Consultant was owned by two individuals
whose relative was a government official in Qatar.

69.     From October 2011 through November 2011, Kuwait Consultant provided an
EAB employee with inside information such as competitor bid information about the Kuwait
Contract tender.

70.     EAB was awarded the Kuwait Contract, which was worth approximately $180
million, in December 2012.

71.     Communications between the representative of the Kuwait Consultant and the
EAB employee in January and February 2013 show that the Kuwait Consultant expected to
receive 3% of the value of the equipment of the Kuwait Contract, and that the representative of

13

the Kuwait Consultant made a "commitment to [his] friends in Kuwait" which he would not pay from his own funds.

72.     In November 2013, Kuwait Consultant escalated the issue to the head of Ericsson's Middle East region, who eventually agreed to make a payment to Kuwait Consultant in the amount of $450,000 through a sham agreement.

73.     On December 12, 2013, an EAB employee sent an email attaching a draft "Consultancy Frame Agreement" between Kuwait Consultant and EAB's branch in Qatar. The email stated, "I have been asked to sort out the mess we got into in Kuwait . . . . I have constructed the attached agreement. . . . I do not want anyone to think that I had anything to do with this just because I am now cleaning up!"

74.     On or around December 18, 2013, the head of Ericsson's Middle East region signed the Consultancy Frame Agreement on behalf of EAB's Qatar branch. The agreement stated that EAB's Qatar branch engaged Kuwait Consultant to provide services "within the area of marketing and sales support to increase customer satisfaction and enhance Ericsson business in Kuwait . . . with the purpose of winning the LTE business with [Kuwait SOE]." These services were never provided. Accordingly, the head of Ericsson's Middle East region asked the Kuwait Consultant to create a sham invoice to support the settlement payment.

75.     In December 2013, EAB's branch in Qatar paid $450,000 to Kuwait Consultant through correspondent bank accounts in New York, New York, to Kuwait Consultant's bank account in Qatar.

76.     Ericsson's books and records did not reflect that this transaction was, in fact, related to an arrangement to reimburse the consultant for payments to unknown recipients. Rather, EAB employees, at the direction of the head of Ericsson's Middle East region, created a

sham contract to disguise the payment to the consultant and approved a fake invoice for services in order to conceal the transaction.

77.     The payment was recorded in the books of EAB's Qatari branch under operating expenses. The financial results of EAB's Qatari branch were consolidated into Ericsson's financial statements.

**China**

78.     Between 2013 and 2016, Ericsson China paid $31.5 million to third party service providers who had connections and access to foreign officials. These third parties did not provide any legitimate services to Ericsson in exchange for the large payments they received.

79.     The purpose of these payments was to allow Ericsson China to continue to use and pay third party agents in China in contravention of Ericsson's policies and procedures.

80.     In 2013, Ericsson instituted a policy restricting the use of third party agents. Ericsson's head of Asia Pacific determined that it was important for Ericsson China's business to continue to engage third party agents with strong connections to Ericsson China's state-owned customers. To continue to use and pay agents who were not approved or paid in compliance with Ericsson's internal procedures, EAB and Ericsson China employees made payments through sham contracts with service providers.

81.     To further avoid detection, EAB and Ericsson China employees processed the payments manually using paper purchase requests, rather than through the electronic computer system.

82.     Ericsson China improperly recorded these payments as "other external services," "site acquisition services" and "service fulfillment of contract." The financial statements of Ericsson China were consolidated into those of Ericsson.

**C.      Ericsson's Willful Failure to Implement and Maintain Sufficient Internal Accounting Controls**

83.      During the relevant period, Ericsson knowingly and willfully failed to implement adequate internal accounting controls with respect to retention of consultants and agents, payment of bribes, and making improper payments.

84.      In particular, Ericsson failed to implement controls to ensure the effective enforcement of its policies and procedures that, among other things, (a) required employees properly to document and account for payments to agents and consultants, including the ultimate recipients of the payments and the reasons for the payments; (b) required adequate due diligence for the retention of third-party agents and consultants; (c) required completed due diligence and a fully executed contract with a third party before the third party could begin providing services; (d) required that agreed-upon payments be commensurate with the services to be performed and that the services paid for were performed; (e) prohibited certain compensation arrangements with third parties, such as advance payments; and (f) established oversight procedures, by personnel at Ericsson's headquarters and others, to ensure that third parties were retained and paid pursuant to appropriate controls.

85.      As an example, Ericsson failed to implement an effective system of internal accounting controls over its third-party consultant in Djibouti. EAB, through its branch in Ethiopia, entered into a consultancy agreement with the Djibouti Consultant before the due diligence on the Djibouti Consultant was completed. Additionally, the agreement with the Djibouti Consultant deviated from Ericsson's standard template agreement, was not properly executed and approved, and provided that the Djibouti Consultant would receive an advance payment, contrary to Ericsson's policies and procedures. Likewise, the due diligence report on the Djibouti Consultant was not signed or approved in compliance with Ericsson's established

management approval requirements, and omitted reference to the high-level official in the government of Djibouti who controlled the Djibouti Consultant. Further, in order to process payments to the Djibouti Consultant on an expedited basis, employees bypassed Ericsson's policies, procedures, and internal accounting controls relating to payment to agents and consultants, at the direction of Ericsson's head of Northeast Africa.

86.     In Saudi Arabia, an EAB Saudi branch employee completed the due diligence on Saudi Consultant A and Saudi Consultant B almost one year after the agreements with the consultants were signed. The due diligence was conducted only because it was required before making payments.

87.     In China, Ericsson failed to implement an effective system of internal accounting controls to prevent or detect the creation of sham service provider arrangements facilitated by fake purchase requests and invoices submitted by third party service providers for services that were never provided. Additionally, Ericsson China employees were able to provide foreign officials with leisure trips and gifts without detection.

88.     In Vietnam and Indonesia, neither Ericsson Vietnam nor Ericsson Indonesia had adequate internal accounting controls to identify the significant red flags raised by the payments to Vietnamese Consultant and Indonesian Consultant.

89.     In Kuwait, the $450,000 payment to the Kuwait Consultant was not approved or paid in compliance with Ericsson's internal accounting controls. There was no written consultancy agreement in place with the Kuwait Consultant and no due diligence was completed at the time the purported services were performed.

**D.     Ericsson's Falsified Books and Records**

90.     Due to Ericsson's failure to implement and enforce effective internal accounting controls, employees were able to disguise the true nature and purpose of certain transactions in Ericsson's books and records.

91.     Ericsson, through its employees and agents, including senior-level employees, paid millions of dollars to various agents, consultants, and service providers who were not approved or paid in compliance with Ericsson's internal procedures. Some of the payments were made in cash and were used to create slush funds, the purpose and recipients of which are unknown. Other payments were made pursuant to sham service provider agreements under which no legitimate services were provided to Ericsson, so as to continue to use and pay agents in contravention of the Company's policies and procedures.

92.     In connection with these payments, Ericsson, through its employees and agents, including senior-level employees, knowingly and willfully created or facilitated the creation of fictitious contracts, invoices, and purchase orders for services that were not rendered and were never intended to be rendered; used secret codenames for certain expenditures; and bypassed Ericsson's standard vendor sourcing process, including by using hard copy, rather than electronic, documentation to evade detection. The payments were falsely or misleadingly characterized in Ericsson's books and records, including as consulting expenses, cost of sales, "corporate marketing fees," "other external services" or "service fulfillment of contract."

93.     Ericsson, through its employees and agents, disguised in its books and records the approximately $2.1 million in bribe payments to, and for the benefit of, foreign officials in Djibouti.

94.     Ericsson, through its employees and agents, disguised in its books and records approximately $40 million in improper payments in connection with obtaining business in Saudi

Arabia. Payments for lavish trips and entertainment intended to influence Saudi foreign officials also were disguised in Ericsson's books and records.

95.     In connection with the conduct described above in China, approximately $31.5 million in payments to third party service providers were inaccurately recorded in Ericsson's consolidated books and records. An additional $19.5 million which was paid to third party consultants to fund gifts and leisure trips given to Chinese foreign officials, was also inaccurately characterized in Ericsson's books and records.

96.     In connection with the conduct described above in Vietnam, approximately $11.4 million in payments to the Vietnamese Consultant were inaccurately recorded in Ericsson's consolidated books and records.

97.     In connection with the conduct described above in Indonesia, approximately $45 million in payments to the Indonesian Consultant were inaccurately recorded in Ericsson's consolidated books and records.

98.     With respect to the conduct described above in Kuwait, the $450,000 payment to the consultant was inaccurately recorded in Ericsson's consolidated books and records.

## FIRST CLAIM FOR RELIEF
### Violations of Section 30A of the Exchange Act
### (Against Defendant)

99.     Paragraphs 1 through 98 are re-alleged and incorporated by reference.

100.     As described above, Ericsson, through its officers, directors, employees or agents corruptly offered, promised to pay, or authorized unlawful payments to one or more persons, while knowing that all or a portion of those payments would be offered, given or promised, directly or indirectly, to foreign officials for the purposes of influencing their acts or decisions in their official capacity, inducing them to do or omit to do actions in violation of their lawful

duties, securing an improper advantage, or inducing such foreign officials to use their influence with a foreign government or instrumentality thereof to assist Ericsson in obtaining or retaining business.

101.    By reason of the foregoing, Ericsson violated, and unless enjoined, will continue to violate, the anti-bribery provisions of the FCPA, as codified at Section 30A of the Exchange Act [15 U.S.C. § 78-dd-1].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 13(b)(2)(B) of the Exchange Act
### (Against Defendant)

102.    Paragraphs 1 through 98 are re-alleged and incorporated by reference.

103.    By engaging in the conduct described above, Ericsson failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorization; and (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for its assets.

104.    By engaging in the conduct described above, Ericsson violated, and unless enjoined, will continue to violate, the internal accounting controls provisions of the FCPA, as codified at Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## THIRD CLAIM FOR RELIEF
### Violations of Exchange Act Section 13(b)(2)(A)
### (Against Defendant)

105.    Paragraphs 1 through 98 are re-alleged and incorporated by reference.

106.    As alleged above, Ericsson failed to keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected its transactions and disposition of its assets.

107.    By reason of the foregoing, Ericsson violated, and unless enjoined, will continue to violate, the books-and-records provisions of the FCPA, as codified at Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §78m(b)(2)(A)].

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Ericsson committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Ericsson, and its officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 30A, 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78dd-1, 78m(b)(2)(A), and 78m(b)(2)(B)].

### III.

Order Ericsson to disgorge all ill-gotten gains, with prejudgment interest, wrongfully obtained from the conduct alleged in this Complaint.

### IV.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## V.

Grant such other and further relief as this Court may determine to be just and necessary.


Dated: December 6, 2019

> /s/ Amy Jane Longo
>
> AMY JANE LONGO
> longoa@sec.gov
> Securities and Exchange Commission
> Los Angeles Regional Office
> 444 S. Flower Street, Suite 900
> Los Angeles, CA 90071
> (323) 965-3835 (Longo)
>
> FINOLA H. MANVELIAN*
> manvelianf@sec.gov
> (323) 965-3980 (Manvelian)
> WENDY E. PEARSON*
> pearsonw@sec.gov
> (323) 965-4546 (Pearson)

*Not admitted in SDNY